Filed 12/8/22  M.M. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| M.M., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF CONTRA COSTA COUNTY, <br><br> Respondent; <br><br> CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU et al., <br><br> Real Parties in Interest. | A166241 <br><br> (Contra Costa County Super. Ct. No. J2100271) |

M.M. (father) seeks extraordinary writ relief from orders terminating reunification services and setting a permanency planning hearing pursuant to Welfare and Institutions Code section 366.26 for his son A-M.T. (minor). Father contends the court erred in not extending services to the 18-month statutory period and in reducing his visitation with minor.

We conclude the juvenile court did not err and deny the writ petition on the merits.

1

## BACKGROUND

In June 2021, the Contra Costa County Children and Family Services Bureau (Bureau) filed a Welfare and Institutions Code section 300 petition,[1] alleging failure to protect (§ 300, subd. (b)) and abuse of a sibling (§ 300, subd. (j)). The petition alleged minor tested positive for opiates and amphetamines at birth, mother and father had substance abuse problems that impaired their ability to parent, and mother had failed to reunify with minor's half-sibling.[2]

In its detention report, the Bureau recommended minor be detained. Both mother and father were unhoused, though they did not live together. Father expressed a desire to have minor with him and "be in his child's life." He reported a "criminal history of mostly repetitive drug charges." Although he admitted to past methamphetamine use, he maintained he currently only smoked marijuana and consumed "no other substances." Father stated he and mother were no longer together and he had stopped seeing her "due to concern for mother's drug use." He stated he had a "bassinet, car seat and ability to stay" with his brother but was not currently staying with him as he did not want "to be a burden on his brother and sister-in-law."

The court ordered minor detained, ordered reunification services for mother and supervised visitation for both parents, and set the matter for a jurisdiction and disposition hearing.[3]

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Mother is not a party to this proceeding.

[3] At that point in the proceedings, father was still an "alleged father" and not eligible for services.

2

The jurisdiction and disposition hearing was continued once to allow for DNA testing for father and another time because father was in custody.

In its October disposition report, the Bureau explained paternal uncle had reported father "was currently incarcerated . . . due to [a] probation violation and [he] has an unknown release date." The social worker confirmed father had been booked in August but was released the following month.

After father was released, the social worker was able to get in contact with him for the report. Father was "currently on probation for the next eight months due to his 2017 possession case." Father maintained he had "last used marijuana 'a couple [of] weeks ago' and would stop using if it was a 'problem' for his dependency case." He reported he had been attending Narcotics Anonymous for "the past thirteen years." Father had only done one drug test out of 11 ordered, but even as to that test, there were no results because the sample "[l]eaked in transit." Father did not provide any information that he had enrolled in the services to which he had been referred, including drug testing, substance abuse treatment, parenting education, and counseling services. He had some job training but was currently unemployed and receiving general assistance. Father had attended "eight out of twelve scheduled visits" with minor since the infant had been detained. Father was "appropriate" during the visits, attending to minor's "basic needs[,] such as feeding him a bottle, burping him, checking/changing his diaper, and talking to the child."

In an August 2021 memorandum, the Bureau noted father had continued to visit minor. He still had not drug tested nor had he provided any information regarding enrollment in any services.

Minor had been placed in a foster home and was "on target developmentally." The Bureau recommended against providing reunification services for mother or father and that the matter be set for a section 366.26 hearing.

At the contested jurisdiction hearing, father submitted on the factual basis for the petition. The court accepted an offer of proof that father had had two positive drug tests in September for marijuana and methamphetamine, sustained the amended petition,[4] raised father's status to "biological," and set the matter for a contested disposition hearing.

In two subsequent memoranda, the Bureau changed its recommendation and now recommended father be offered reunification services. The Bureau explained father had attended all of his visits for October and November, and at the visits he continued to be "attentive to [minor's] basic needs." Father had completed a substance use assessment and had an intake appointment with an outpatient treatment program. Additionally, father had done six out of seven drug tests, testing positive for marijuana each time.

Father's case plan objectives included: obtaining and maintaining a "stable and suitable residence" for himself and minor, staying free from "illegal drugs and show[ing an] ability to live free from drug dependency" which included substance abuse testing, visiting minor regularly, and attending individual counseling and parenting education classes. (Boldface omitted.)

---

[4] The amended petition stated father "has a substance abuse problem that impairs his ability to parent," that father had tested positive for methamphetamines and marijuana, that father uses marijuana, and that he has "been convicted of multiple substance abuse criminal charges."

4

At the disposition hearing, the court adjudged minor a dependent of the juvenile court, found by clear and convincing evidence that there was substantial danger and detriment to minor's well-being if returned, continued supervised visitation, ordered reunification services for father and mother, and set the matter for a six-month review hearing.

In its six-month report, the Bureau recommended terminating services for mother and continuing services for father. Father's "living situation" remained "unconfirmed." He was in "the process of trying to obtain housing" and had been working with a "parent support person." The support person explained the "struggles in securing housing" that would allow fathers and their children because many housing options "do not allow children due to potential sex offenders that may be at these facilities." And although father reported he was living in paternal uncle's home, paternal uncle "definitively stated [father] has never lived with him, but merely spends a few nights a month in his home."

He had not obtained employment but was still receiving disability pay and benefits through the CalFresh program. Father reported he had been attending weekly therapy and weekly parenting classes, and the Bureau was attempting to contact his instructor to confirm. He had also attended an outpatient substance abuse program, completed an outpatient relapse prevention program, and had tested 14 out of 24 times since the disposition hearing. Father "consistently" tested positive for marijuana and had once tested positive for methamphetamine. However, father denied using methamphetamine. The social worker consulted an addiction specialist who opined the level of marijuana present in father's test results were "not necessarily cause for concern" but that the test result levels for methamphetamine was " 'pretty high.' " (Italics omitted.) Finally, father had

been in weekly contact with the Bureau and had attended "17 of 19 possible visits" with minor.

Minor, who was then 11 months old, was continuing to do well in his foster care placement.

The court adopted the Bureau's recommendations and set the matter for a 12-month review hearing.

In its 12-month report, the Bureau recommended termination of services for father and that the court set a section 366.26 hearing. Father had still not obtained stable housing. He explained he stayed with his girlfriend one night a week and that he stayed with his brother four nights a week. However, after the social worker informed father paternal uncle stated he was not living with him, father admitted he had since "had a falling out with his brother." Although father had qualified and submitted an application for a housing voucher, he had not pursued it and a counselor informed the Bureau they had not heard from father "in several months."

The Bureau had finally been able to reach father's parenting class instructor, who reported although he had enrolled in parenting classes he had "only attended the first two sessions and 'never came back.'" (Italics omitted.) Father had drug tested 13 out of 14 times and had tested positive for marijuana nine of those times. Father had "not had any contact" with his substance abuse counselor since May 2022. Father's visitation had been increased from one hour to two hours a week, and father had attended "nine of 11 possible visits." The visits were "characterized [as] affectionate and loving gestures by [father] toward his son," and he continued to demonstrate the proper "ability to feed [minor] and change his diaper."

Minor was now 14 months old and continued to do well in his placement. The Bureau was recommending termination of services because

6

father had not fulfilled several case plan objectives:  obtaining stable and suitable housing, and obtaining resources to meet his and minor's needs. Although the Bureau was "aware that there is extremely limited housing resources for single fathers," it noted father had not "committed himself to the fullest extent possible" in obtaining suitable housing.  Additionally, father had "not followed through on pursuing means to supplement his income in order to be able to provide for himself and [minor]."  The Bureau concluded that "[d]espite 12 months of services, [father] has not been able to ensure a sense of stability in his life, or demonstrate that he can effectively fulfill a parental role."

After the review hearing was continued, the Bureau provided an updated memorandum.  Father stated he was on the waitlist for two housing programs.  However, the social worker was informed by one program that they had "no record of contact" with father, and the second program informed the Bureau that "attaining waitlist updates is exceedingly difficult as the facility is overburdened."  Father was no longer "engaged in therapy," stating he had "discontinued therapy in order to focus on his housing concerns." Father had missed his last 10 drug tests, and while he had previously been "proactive in communicating and utilizing the assistance of his parent support person," he had not contacted her since "shortly after the August 4th hearing."  However, father continued to attend visits, making "six of seven possible visits."

The Bureau remained concerned about father's lack of stable housing, his failure to report an update regarding pursuit of additional income and found it "extremely" concerning that father had since missed "10 consecutive" drug tests.  The Bureau continued to recommend termination of services,

setting of a section 366.26 hearing, and a move toward adoption for minor by his foster mother.

At the review hearing, the court heard from the social worker, father, and counsel.

The social worker explained father had stopped drug testing after the August hearing, and although she had reached out to father about this he had not responded. There had been a "couple of things" which had held up father "on getting adequate housing." "[M]any of the housing options out there, whether they be shelters or . . . sober living environments, do not allow for fathers with their children." However, beyond this issue, father "didn't follow through on some of the guidance he was given . . . with regard to making phone calls and following up on certain housing options." And, even though the Bureau had also suggested father find "stable housing for himself first and then worry about housing where he could have the child," he had not done so. For example, paternal uncle, who was employed as a "reentry specialist" and worked in conjunction with a "correctional facility," had reported early in the proceedings that he had " 'a bed available for the father if he's open and willing,' " at a Marin County shelter, through a Catholic Charities nonprofit. The housing would have been for a year and included " 'laundry and paid housing services.' " However, father had not followed up on this referral. Finally, father had not completed parenting classes and had stopped counseling.

Father stated he applied for four housing options. He was still on the waitlist for two, one did not take fathers with children, and he had just gotten a "new referral" with the fourth. Father stated it was his "understanding" that he had to look for a housing option "that would accept me and my child," so that is what he pursued. He did look into other

8

resources for housing, for example the one in Marin, but stated "the Marin thing and Motel 6 out there was kind of hard and stressful to me running from Marin and back out here." Additionally, father thought "everything had to be in this county."

He acknowledged he had not "really been in touch with the social worker" since the August hearing because he thought his services "were being discontinued." This is also why he stopped drug testing. He asserted that although he had not drug tested, he had now stopped using marijuana. He stopped counseling because his previous social worker told him "that I had eight weeks of therapy to do," and he stopped because he had done eight weeks. He had stopped drug counseling because he had not "been able to reach out because . . . I didn't have transportation."

He stated if services were continued, he would restart drug testing, counseling, and "look into other resources for housing." He also maintained he was currently subletting a room and his landlord would allow overnight visits with minor.

Counsel for father objected to termination of services, contending father had a "positive relationship with the child" and that if services were extended "[f]ather would be able to successfully reunify." Counsel maintained "there was a big misunderstanding by [father] that when that report stated that the Bureau was recommending the Court terminate family reunification services, he thought things were over . . . and that the only thing he needed to do at this hearing was to show . . . if he had housing." Additionally, counsel noted visitation with minor was "positive." Father had drug tested "on a fairly regular basis" and the "last positive test for methamphetamine was quite a long time before that." Finally, father had been "working diligently on trying to find housing."

Counsel for the Bureau found it "difficult . . . to believe [father] thought the case was over after the August hearing." Because despite the fact father knew "we were coming back for the stated purpose of him demonstrating that he had successfully obtained housing so that he could reunify with his son," he did not "tell anybody that he . . . was successfully housed in a place where he believes he could safely have . . . overnight visits." Counsel also found it "difficult to understand" why father failed to respond to texts and outreach. Although father "had some limited engagement in formal therapy . . . and some counseling sessions," he had not "demonstrated . . . any insight into why he was engaged in those services," and stopped doing so "when he thought the case was over." And, "while it [was] unfortunate that there are limited housing options for fathers with children," father had failed to accept the assistance of paternal uncle "at the beginning of this case" in obtaining housing. Additionally, counsel asserted the case involved more than housing "because of [f]ather's long history of chronic [drug] use and trouble with the law," which included "multiple convictions" and "as recently as April" a positive test for methamphetamine. Finally, father had never lived with minor, and minor did not "have any disruptions at all ending the visits and is happy to be on his way."

The court credited the social worker's testimony and had "some difficulty crediting" father's testimony. Father's "explanation of his reasons for stopping all services and yet knowing that he was coming back here today in an effort to prove that he had housing so he could get his son back does seem to be inconsistent and defy logic."

The court determined father had a "very extensive criminal history," including "12 convictions for drug-related crimes over the last 30 years." The court was "concern[ed]" father "has not been truthful . . . about where he was

staying." For example, claiming to "be staying with his brother when he was not." Father also "was given a number of leads that he failed to follow up on," including failing to take "an offer of a free residence for a year . . . in Marin County," which would have been "considerably better than no residence and would have enabled [father] to become more stable and to save up money for his own place after a year." The court calculated father had only attended 27 out of 48 drug tests, and had missed the last 10 tests, which meant "the Court has no assurance that he's not presently using controlled substances." Finally, the court found father did complete an outpatient program and that visits with minor had gone well, however, father's attendance at therapy "was spotty" and he only attended two parenting classes.

The court concluded by stating, "[t]his is, by law, a case that was supposed to have lasted six months," but was extended to "12 months in hopes of enabling [father] to reunify." But since the last six-month review father had "stopped engaging in services." Minor was "bonded strongly to his foster mother and her children," had "become part of their family," and was "safe at his current residence."

The court terminated services, reduced visitation to one hour per week, and set the matter for a section 366.26 hearing.

## DISCUSSION

### *The Court Did Not Err in Terminating Services*

Father does not take issue with the adequacy of services, rather he contends the trial court should have extended services beyond the 12-month statutory period.

At the 12-month review hearing, section 366.21, subdivision (g)(1) allows the juvenile court to continue reunification services for up to six months "only if [the court] finds that there is a substantial probability that

11

the child will be returned to the physical custody" of his parent. "[I]n order to find a substantial probability that the child will be returned," the court shall be required to find: "(A) That the parent . . . has consistently and regularly visited with the child. [¶] (B) That the parent . . . has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) The parent . . . has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (*Id.*, subd. (g)(1)(A)-(C).)

"We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.)

The court here found, and the Bureau does not challenge, that father consistently visited minor and the visits had "gone well." The court went on to state that "visiting alone is not sufficient to continue services."

It is clear, on this record, that the evidence does not show father demonstrated an ability to complete his treatment plan and to provide for minor's safety and physical and emotional well-being, in the short period of time that remained before the expiration of the 18-month statutory mark, which at the time of the 12-month hearing was less than three months away. (§ 366.21, subd. (g)(1)(C).) Among other things, father's case plan called for him to (1) stay free from illegal drugs and show his ability to live free from

12

drug dependency, including by complying with all drug tests; (2) obtain and maintain stable and suitable housing for himself and minor; (3) obtain "resources to meet the needs" of minor and to provide a safe home; (4) attend individual counseling; and (5) successfully complete a parenting education class.

As father notes, the court did find he was making "significant progress" in resolving the issues that led to minor's removal at the six-month review hearing. However, by the time of the 12-month review hearing, father had "essentially . . . stopped" engaging in services.

The court determined father had only "attended 27 of 48" drug tests (a "56 percent rate"), he had stopped working with his drug counselor, he had only attended two parenting classes, he had not looked for employment, and he had stopped going to individual counseling. The court found father's lack of participating in any substance abuse services particularly concerning given father's "extensive criminal history, including drug trafficking crimes," which involved "at least 12 convictions for drug-related crimes over the last 30 years." The court did not credit father's testimony of why he stopped services, and concluded that "discontinuing those services" did not give the court "confidence that [father] is refraining from drug use."

Additionally, father had not adequately pursued his case plan objective to obtain stable housing. The court was concerned that father had "not been truthful . . . about where he was staying." Although father repeatedly told the Bureau he was staying with his brother, that was, in fact, not the case. Further, father had failed to follow up on several referrals and seek alternative options. Indeed, he had not pursued an opportunity for "a free residence for a year with laundry services in Marin County," which the court

13

noted would have allowed father "to become more stable and to save up money for his own place after the year."

At the 12-month review hearing, the question is whether there is a "substantial likelihood" of reunification by the 18-month mark. The court found that was not the case, and that finding is supported by substantial evidence as we have recited above.

### *The Court Did Not Err in Reducing Visitation*

Father contends the juvenile court abused its discretion when, upon terminating services, it reduced his visitation with minor from two hours per week of supervised visits to one hour per week.

Where the parent is unsuccessful and the court terminates reunification services, "the parents' interest in the care, custody and companionship of the child are no longer paramount." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); accord, *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Instead, "the focus shifts to the needs of the child for permanency and stability." (*Marilyn H.,* at p. 309.) Despite this shift, "[i]n any case in which the court orders that a hearing pursuant to Section 366.26 shall be held, . . . [t]he court shall continue to permit the parent . . . to visit the child pending the hearing unless it finds that visitation would be detrimental to the child." (§ 366.21, subd. (h).) The juvenile court determines "when, how often, and under what circumstances visitation is to occur." (*In re Shawna M.* (1993) 19 Cal.App.4th 1686, 1690.) We review the court's visitation ruling for an abuse of discretion. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1279; *In re Megan B.* (1991) 235 Cal.App.3d 942, 953 [juvenile court vested with broad discretion concerning visitation].)

Here, the court maintained weekly visitation but reduced it from two hours per week to one hour per week, which complies with section 366.21's

14

mandate of continued visitation.  The court made this decision after hearing from all counsel, including father's, who urged the court "at a minimum" to maintain weekly visits, which the court did.  Although father maintains visitation is "an element critical to promotion of the parents' interest in the care and management of their child" and that a reduction in visitation may harm his ability to establish the parent-child beneficial relationship exception to termination at the section 366.26 hearing, his "interest in the care, custody and companionship of [minor is] no longer paramount." (*Stephanie M., supra*, 7 Cal.4th at p. 317.)  Father has not shown any abuse of discretion with respect to the visitation order.

## DISPOSITION

The petition for extraordinary writ relief is denied on the merits. (§ 366.26, subd. (*l*)(1)(C), (4)(B).)  The request for stay is denied, and this decision is final as to this court immediately.  (Cal. Rules of Court, rules 8.452(i) & 8.490(b)(2)(A).)

15

_____
Banke, J.

We concur:

_____
Humes, P.J.

_____
Devine, J.*

*Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A166241, MM v. superior Court of Contra Costa